Vincent E. Gentile, Esq.
Ingrid D. Johnson, Esq.
Antoinette Snodgrass, Esq.
Brendan P. McHugh, Esq.
**DRINKER BIDDLE & REATH LLP**
A Delaware Limited Liability Partnership
105 College Road East
Princeton, NJ  08542-0627
Tel.:  (609) 716-6500
Fax:  (609) 799-7000
*Attorneys for Plaintiffs*

## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| D.A., S.K., and L.M., on behalf of themselves and others similarly situated, | Civil Action No.: 18-cv-09214 |
| Plaintiffs, | |
| v. | |
| Kirstjen NIELSEN, Secretary of Homeland Security; Thomas D. HOMAN, Deputy Director and Senior Official Performing the Duties of the Director, U.S. Immigration and Customs Enforcement; Matthew ALBENCE, Executive Associate Director for Enforcement and Removal Operations, U.S. Immigration and Customs Enforcement; John TSOUKARIS, Newark Field Office Director for Enforcement and Removal, U.S. Immigration and Customs Enforcement; Jefferson B. SESSIONS, Attorney General of the United States; and James McHENRY, Director, Executive Office of Immigration Review; all in their official capacities, | |
| Defendants. | |

## CLASS COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

1.     This is a class action complaint for declaratory and injunctive relief brought by

Plaintiffs D.A., S.K., and L.M.[1] ("Plaintiffs") on behalf of themselves and a class of similarly

---

[1]  Because they fear for their safety, D.A., S.K., and L.M. pursue this case anonymously.  A motion to proceed anonymously has been filed with this Complaint.

situated individuals.  Plaintiffs and the members of the class they seek to represent ("Proposed Class Members") are seeking asylum in the United States after fleeing persecution in their countries of origin and presenting themselves to U.S. immigration authorities at a port-of-entry. All of them have been found to have a "credible fear" of persecution or torture in their home country, and thus all have established a "significant possibility" of establishing their eligibility for asylum.  *See* 8 U.S.C. § 1225(b)(1)(B)(v).

2.      Plaintiffs bring this action to challenge their arbitrary and indefinite detention in prison-like conditions.  They are being detained under the authority of the Newark Field Office of the United States Immigration and Customs Enforcement Agency ("ICE") during the pendency of their asylum applications.

3.      At the core of their claim is Defendants' failure—in contravention of the laws and Constitution of the United States—to provide individualized custody reviews to determine whether their incarceration is justified.  Plaintiffs seek injunctive and declaratory relief mandating individualized custody reviews through the "parole" process set forth in Section 1182(d)(5) of the Immigration and Naturalization Act ("INA"), 8. U.S.C. § 1101 *et seq.*, and corresponding regulations.

4.      Individuals who are detained under the authority of ICE's Newark Field Office are almost uniformly denied parole and are thus subject to a *de facto* no-parole policy.  As a group, they are repeatedly and systematically denied parole, despite establishing factors that should otherwise allow their release from detention.  Plaintiffs challenge this *de facto* policy to deny parole.

5.      D.A., S.K., and L.M. have been detained since January 27, 2018, November 10, 2017, and January 11, 2018, respectively, in the Elizabeth Contract Detention Facility, which is

located at 625 Evans Street in Elizabeth, New Jersey 07201.  Each applied for parole and, in their applications, established their identities and provided proof that they are neither a flight risk nor a danger to the community.  These are factors that should have allowed them release under parole.  *See* 8 C.F.R. § 212.5(b).

6.      Upon information and belief, this *de facto* policy to deny parole has deterred otherwise-eligible asylum seekers from seeking an individualized review of their detention through the parole process.

7.      Upon information and belief, this *de facto* policy to deny parole has deterred otherwise-eligible asylum seekers from pursuing their asylum claims, as some individuals would rather return to their country of origin, where they have a credible fear of suffering persecution, than be detained in prison-like conditions indefinitely.

8.      Plaintiffs seek, among other relief, an Order for themselves and the Proposed Class Members (i) declaring that their continued detention, in the absence of an individualized parole review, is unlawful and unconstitutional and (ii) requiring Defendants to provide D.A., K.S, L.M., and the Proposed Class Members with individualized ICE parole reviews, as required by the INA, applicable regulations, and the Due Process Clause of the Constitution of the United States.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), 5 U.S.C. § 702 (waiver of sovereign immunity), and the Due Process Clause of the Fifth Amendment of the U.S. Constitution.

10.     Venue is proper under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this action occurred in this District.  In the alternative, venue is proper

92591455.1

in this District pursuant to 28 U.S.C. § 2241(d) because Plaintiffs and the Proposed Class Members are detained at facilities within this District.

## PARTIES

### The Proposed Class Members

11.    Plaintiffs and the Proposed Class Members are individual asylum seekers who are being held in detention under the authority of ICE's Newark Field Office.  They all have been found to have credible fear of persecution or torture, have been referred for asylum hearings, and are eligible for parole under the INA and corresponding agency regulations.  Due to the Newark Field Office's *de facto* policy to deny parole, Plaintiffs and the Proposed Class Members have been denied the opportunity to be released from detention during the pendency of their asylum proceedings.

### Plaintiff D.A.

12.    D.A. is from Nigeria.  He arrived in the United States on or about January 27, 2018, and has been detained since his arrival.  D.A. is currently detained at the Elizabeth Contract Detention Center.

13.    D.A. sought asylum upon arrival.  On February 5, 2018, an immigration officer determined that D.A. had a credible fear of persecution, and the officer's credible fear determination was approved by a supervisor on February 6, 2018.

14.    D.A. is an ordained minister in the Redeemed Christian Church of God ("RCCG") in Nigeria.  He is also the founder of a Christian organization that provides medical aid and spiritual support to Nigerian Christians, including those who have been brutalized by Boko Haram, a radical Islamist terror group that has a strong presence in Nigeria.

15.    D.A. fears persecution due to his religion and his ministry.

16.     Because of his faith and leadership in the Christian community, D.A. became a target of Boko Haram.  In August 2017, while conducting a Christian medical aid mission in Northern Nigeria, D.A. and his team were captured by Boko Haram.  During the attack, Boko Haram shouted that it was their mission to seek out and kill the "infidels."  D.A.'s Christian host in Northern Nigeria was shot, and his home was burned to the ground.  D.A. was severely beaten, had two of his teeth knocked out, and was slashed with a machete, but he managed to escape.  In total, four of D.A.'s colleagues were killed in the attack.

17.     Boko Haram had a photo of D.A. that allowed them to specifically identify him during the attack.  After the attack, Boko Haram called D.A. repeatedly to threaten his life, telling him that he "cannot run from them" and that "they were everywhere."  D.A. reported these threats to the police, but the police told him that they could not protect him.  Later, Boko Haram chased and shot at D.A. when he was driving in his car.

18.     D.A. fears that if he returns to Nigeria, Boko Haram will find and kill him.

19.     During his detention in the United States, he received a "Parole Advisal and Scheduling Notification" form, but he was never interviewed by a Decision Review Officer ("DRO") about his parole eligibility as required by ICE's own policy.

20.     After obtaining pro bono counsel, D.A. applied for parole on March 23, 2018. The parole request detailed the facts surrounding D.A.'s asylum application and circumstances leading to his flight from Nigeria.  It also explained that D.A. was a minister.

21.     With his parole request, D.A. submitted the Record of Determination/Credible Fear Worksheet (Form I-870) completed by Asylum Officer Paul E. Gleason, which shows that D.A. made credible statements that established his identity with a reasonable degree of certainty and that D.A. arrived with a passport and a visa.

92591455.1

22.     D.A. also submitted with his parole request a letter of sponsorship from O.A., a United States citizen, a member of and an administrator at a parish of D.A.'s church, the RCCG, in Charlotte, North Carolina.  O.A. knows D.A. through his relationship with D.A.'s pastor in Nigeria.  In his letter, O.A. promises to provide D.A. with a place to stay if he is paroled, to support him while he is in the U.S., and to ensure that D.A. attends immigration hearings.  O.A. provided ICE with his address and a copy of his U.S. passport to prove his citizenship.

23.     Despite this, D.A.'s parole request was denied in a form letter dated March 30, 2018.  Without explaining why the documents and evidence were insufficient, ICE merely checked the box stating "You have not established to ICE's satisfaction that you will appear as required for immigration hearings, enforcement appointments, or other matters if you are paroled from detention."  ICE did not explain why it rejected O.A.'s letter assuring that he would vouch for D.A.'s required appearances in the denial letter, or why it believed that D.A., a Christian minister, would pose a flight risk.  ICE's form letter states that "[w]hile the decision whether to grant parole is discretionary, ICE policy is generally to grant parole to aliens determined to have a credible fear if they establish their identity and that they pose neither a flight risk nor danger to the community."

24.     Other than being addressed to D.A., the denial letter does not address any of the specific facts and circumstances in D.A.'s application.

25.     D.A. has no criminal convictions anywhere in the world and poses no threat to the community.

26.     Upon information and belief, a DRO did not complete a "Record of Determination/Parole Worksheet" within seven days of the credible fear finding, as required under ICE's own policy.

92591455.1

27.    D.A. has not been outside in open air since he has been detained.

28.    D.A. suffers from loss of sleep, nightmares, and flashbacks.  He frequently wakes up to find others in his bunk area trying to calm him down from a nightmare.

29.    D.A. describes his isolation and his wish to contact his family.  D.A. tries to stay in contact with his wife and young daughter in Nigeria, but the phone calls from the detention center are prohibitively expensive and cost more than a call from outside the detention center.

30.    At the Elizabeth Contract Detention Center, D.A. is served rice at virtually every meal, although sometimes he is served bread.  His meals have almost no variety and rarely have fresh vegetables or a protein source.

### *Plaintiff S.K.*

31.    S.K. is from the Togolese Republic.  He arrived in the United States on or about November 10, 2017.  He has been detained since his arrival and is currently detained at the Elizabeth Contract Detention Center.

32.    S.K. sought asylum upon arrival.  An immigration officer, on November 20, 2017, determined that S.K. had a credible fear of persecution and a credible fear of torture and that there was a significant possibility that the assertions underlying his claim could be found credible at a hearing.  This credible fear determination was approved by a supervisor on November 21, 2017.

33.    S.K. does not speak English, and his native language is French.

34.    S.K. fears persecution and torture due to his political opinions.  S.K. is an active member of the Pan-African National Party ("PNP"), which opposes the Togolese government and organizes protests.  After attending a protest in support of the PNP, S.K. was beaten and

92591455.1

stabbed in his face and subsequently hospitalized.  He bears a prominent scar on his left cheek from this injury.

35.    Following S.K.'s participation in another protest, the police targeted him and attacked him with tear gas.  He was arrested by the Togolese security forces and detained for five days, during which time he was beaten daily and subjected to a variety of inhumane treatment and conditions.

36.    S.K. fled the Togolese Republic because he believes that if he stays, he will be subject to additional persecution and torture from the police and the government.  He has learned that the police have searched for him since his departure.

37.    Prior to obtaining counsel, S.K. applied for parole on December 5, 2017.

38.    In support of S.K.'s parole request, S.K.'s cousin's wife, P.G., submitted a letter of sponsorship.  P.G. is a United States citizen.  P.G. has known S.K. for fifteen years and considers him to be a person of "good moral character."  In her letter, P.G. promised to provide S.K. with a place to stay if he is paroled.  She provided ICE with her phone number and a copy of her U.S. passport.  She provided utility and telephone bills to prove her address.  She also provided copies of her income tax returns, pay stubs, a home mortgage bill, her driver's license, and her husband's green card.

39.    Asylum Officer Gizachew Emiru completed Form I-870, Record of Determination/Credible Fear Worksheet, for S.K. on November 20, 2017.  This form shows that S.K. made credible statements that established his identity with a reasonable degree of certainty and that S.K. arrived with a passport and a visa.   S.K.'s parole application was supported by this document.

92591455.1

40.    A DRO never interviewed S.K. regarding parole, as required by ICE's own policy.

41.    Upon information and belief, a DRO never completed a "Record of Determination/Parole Worksheet" within seven days of S.K.'s credible fear finding.

42.    Despite this, S.K.'s parole request was denied in a form denial letter dated December 12, 2017.  Without any reference to the documents and evidence, ICE denied S.K.'s parole application and merely checked the box stating "You have not established to ICE's satisfaction that you will appear as required for immigration hearings, enforcement appointments, or other matters if you are paroled from detention."  ICE did not say why it rejected P.G.'s letter or had reason to think S.K. would be a flight risk.  S.K.'s denial letter states that "[w]hile the decision whether to grant parole is discretionary, ICE policy is generally to grant parole to aliens determined to have a credible fear if they establish their identity and that they pose neither a flight risk nor danger to the community."

43.    Other than being addressed to S.K., the denial letter does not refer in any way to the specific facts or circumstances of S.K.'s application.

44.    The parole denial letter was in English, and he was provided no written or verbal translation in French.

45.    S.K. has no criminal convictions anywhere in the world and poses no threat to the community.

46.    At the Elizabeth Contract Detention Center, S.K. has no access to the outside at any time.

47.    S.K. has lost his appetite because he can no longer eat the meals of rice that he is provided at nearly every meal.

92591455.1

48.    S.K. feels ill all the time, but when he goes to the medical staff on site, they tell him that they can find nothing wrong with him.

49.    Due to the detention conditions and because his incarceration by ICE exacerbated the trauma that he had already suffered as a torture survivor, S.K. cried for two weeks when he arrived at the detention center.

50.    The telephone rates charged to detainees make it too expensive for S.K. to contact his loved ones.

### Plaintiff L.M.

51.    L.M. is from the Republic of Angola.  He arrived in the United States on or about January 11, 2018.  He has been detained ever since his arrival.  L.M. is currently detained at the Elizabeth Detention Center.

52.    L.M. sought asylum upon arrival.  An immigration officer, on January 23, 2018, determined that L.M. had a credible fear of torture.  This credible fear determination was approved by a supervisor on January 24, 2018.

53.    L.M. does not speak English.  His primary language is French.

54.    L.M. fled Angola after persecution by Angola's Secret Police.  In October 2017, the Secret Police arrived at L.M.'s home late at night and demanded that L.M. provide them with information about his friend and employer, a supporter of the opposition party who was deemed "missing" but, in fact, had fled Angola.  The Secret Police took L.M.'s newborn baby and put her in the freezer, threatening to lock the freezer if L.M. did not cooperate.  L.M.'s wife desperately shouted and pleaded with the Secret Police, and the Secret Police released the baby but put a hood over L.M.'s head and kidnapped him.  The Secret Police took L.M. to an undisclosed location, where he was blindfolded, tied to a chair, beaten with the butt of an automatic rifle, spit

92591455.1

on, denied food, and was forced to defecate on himself. The Secret Police demanded that L.M. provide them with information about his friend and employer. After L.M. passed out from two days of torture, the Secret Police threw L.M. from a car and left him for dead in the road. He was rescued by villagers.

55.     In December 2017, the Secret Police again came looking for L.M. in his home, but L.M. managed to escape through a window while his wife distracted the Secret Police at the door. The Secret Police told his wife that they were "looking for [his] head." L.M. went into hiding for a month before fleeing to the United States.

56.     L.M. is certain that the Secret Police will find him and kill him if he returns to Angola and that other government authorities cannot protect him.

57.     After his credible fear determination, ICE did not supply L.M. with information on how to apply for parole. Further, ICE never provided L.M. with the required "Parole Advisal and Scheduling Notification" and never scheduled a parole interview for him.

58.     A DRO never interviewed L.M. regarding parole.

59.     Upon information and belief, a DRO never completed a "Record of Determination/Parole Worksheet" within seven days of his credible fear finding.

60.     After obtaining pro bono counsel, L.M. applied for parole on March 26, 2018.

61.     With his parole request, L.M. submitted Form I-870, Record of Determination/Credible Fear Worksheet, completed by Asylum Officer Paul E. Gleason. This form shows that L.M. made credible statements that established his identity with a reasonable degree of certainty. L.M. also arrived with a passport and a visa.

62.     In support of L.M.'s parole request, an individual, Pastor D.K., submitted a letter of sponsorship. Pastor D.K. is the senior pastor of a church in Manchester, New Hampshire.

92591455.1

Pastor D.K. is a United States citizen.  Pastor D.K. states that he knows L.M. through L.M.'s church in Angola.  L.M. played piano and led services at the church when Pastor D.K. visited during a conference of preachers in Angola.  In his letter, Pastor D.K. promises to provide L.M. with a place to stay and accompany him to future hearings.  He provided ICE with his address and his church's address and attached a copy of his U.S. passport to prove his citizenship.

63.    Despite this, L.M.'s parole request was denied through an undated form letter apparently transmitted on April 10, 2018.  Without any reference to the documents and evidence, ICE denied L.M.'s application for parole, and merely checked the box stating "You have not established to ICE's satisfaction that you will appear as required for immigration hearings, enforcement appointments, or other matters if you are paroled from detention."  ICE did not say why it rejected Pastor D.K.'s letter or had reason to believe L.M. would be a flight risk.  L.M.'s denial letter states that "[w]hile the decision whether to grant parole is discretionary, ICE policy is generally to grant parole to aliens determined to have a credible fear if they establish their identity and that they pose neither a flight risk nor danger to the community."

64.    Other than being addressed to L.M., the denial letter does not address any of the specific facts or circumstances of L.M.'s application.

65.    L.M. has never been convicted of a crime and poses no threat to the community.

66.    L.M. suffers from trauma and anxiety.

67.    L.M. believes that if his life were not in certain danger in Angola, he would not be able to endure the conditions he lives in now.  He eats rice for virtually every meal, is unable to be in the open air, cannot have regular contact with his family because of the prohibitive cost of phone calls, cannot worship in his own language (French), and is isolated from fellow detainees because he speaks French.

68.     L.M. repeatedly asked for a long-sleeved shirt to cover his bare arms because he was cold.  L.M. was detained for more than three months and made numerous requests before the shirt was provided to him.

### Defendants

69.     Defendant Kirstjen Nielsen is sued in her official capacity as the Secretary of the Department of Homeland Security ("DHS").  In this capacity, she directs each of the component agencies within DHS, including ICE.  Defendant Nielsen is responsible for the administration of immigration laws and policies pursuant to 8 U.S.C. § 1103, including those laws and policies regarding the detention and release, through parole or otherwise, of asylum-seeking individuals.  Defendant Nielsen is also responsible for the policies and regulations of DHS and ICE.  Her address is U.S. Department of Homeland Security, Washington, D.C. 20528.

70.     Defendant Thomas D. Homan is Acting Director for ICE.  In this capacity, Defendant Homan directs the administration of ICE's detention policies and operations, including those policies and operations regarding the detention and release, through parole or otherwise, of asylum-seeking individuals.  His address is U.S. Immigration and Customs Enforcement, 500 12th St., SW, Washington, D.C. 20536.

71.     Defendant Matthew Albence is sued in his official capacity as Executive Associate Director for ICE's Enforcement and Removal Operations ("ERO").  In this capacity, Defendant Albence oversees, directs, and coordinates policies and operations throughout the nation's ERO field offices and sub-offices, including those policies and operations regarding the detention and release, through parole or otherwise, of asylum-seeking individuals.  He has the authority to make decisions regarding the parole of Plaintiffs and the Proposed Class Members pursuant to 8 C.F.R. § 212.5(a).  His address is U.S. Immigration and Customs Enforcement, 500 12th St., SW, Washington, D.C. 20536.

92591455.1

72.     Defendant John Tsoukaris is sued in his official capacity as the Newark Field Office Director for Enforcement and Removal for ICE.  In this capacity, Defendant Tsoukaris oversees, directs, and coordinates policies and operations in New Jersey for ICE, including those policies and operations regarding the detention and release, through parole or otherwise, of asylum-seeking individuals.  He has the authority to make decisions regarding the parole of Plaintiffs and the Proposed Class Members pursuant to 8 C.F.R. § 212.5(a).  His address is U.S. Immigration and Customs Enforcement, Newark Field Office, 970 Broad St., 11th Fl., Newark, NJ 07102.

73.     Defendant Jefferson B. Sessions is sued in his official capacity as the Attorney General of the United States and the head of the U.S. Department of Justice ("DOJ").  He has the authority to interpret the immigration laws of the United States and adjudicate removal cases. The Attorney General delegates this responsibility to the Executive Office for Immigration Review ("EOIR"), which administers the immigration courts and the Board of Immigration Appeals ("BIA").  He has the authority to make decisions regarding the parole of Plaintiffs and the Proposed Class Members pursuant to 8 U.S.C. § 1182(d)(5).  His address is U.S. Department of Justice, 950 Pennsylvania Avenue, Washington, D.C. 20530-0001.

74.     Defendant James McHenry is sued in his official capacity as the Acting Director of the Executive Office for Immigration (EOIR), the agency within DOJ that is responsible for immigration courts and the BIA.  As such, he is the Attorney General's designee and has authority to make decisions regarding the parole of Plaintiffs and the Proposed Class Members pursuant to 8 U.S.C. § 1182(d)(5).  His address is the EOIR, 5107 Leesburg Pike, Falls Church, VA 22041.

## **LEGAL BACKGROUND**

### **Asylum**

75.     The INA sets forth the conditions under which a foreign national may be admitted to and remain in the United States and grants DHS the discretion to initiate removal proceedings.

76.     Under the INA, noncitizens who are "inadmissible" and arrive at a port-of-entry to the United States are subject to "expedited removal," or a streamlined process that permits low-level immigration officers to order the noncitizen removed without a hearing before an immigration judge.  8 U.S.C. §§ 1225(b)(1)(A)(i)–(iii).

77.     If, however, the noncitizen can demonstrate a "credible fear" of persecution in her home country during the initial screening by an asylum officer, she is referred to "regular" removal proceedings before an immigration judge, and, if unsuccessful, she may file an administrative appeal with the BIA.  *See R.I.L.R. v. Johnson*, 80 F. Supp. 3d 164, 171 (D.D.C. 2015) (citing 8 U.S.C. § 1225(b)(1)(B)(ii); 8 C.F.R. § 208.30(f)).  If an individual can establish "credible fear of persecution," there is a "significant possibility . . . that the alien could establish eligibility for asylum."  8 U.S.C. § 1225(b)(1)(B)(v).

### **Detention**

78.     For immigration detainees, as with other detainees, "[f]reedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty" protected by the Due Process Clause.  *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001).

79.     Detention authority over people arriving in the United States who establish a credible fear while waiting for consideration of their asylum claims is governed by 8 U.S.C. § 1225(b)(1)(B)(ii).  That provision specifically addresses the period between the individual's

apprehension at the border and the initiation of regular removal proceedings. It provides that individuals found to have a credible fear "shall be detained for further consideration" of their application for asylum, which occurs at a removal hearing before an immigration judge. *Id.*

80.    These individuals are also immediately eligible for release on parole. *See* 8 U.S.C. § 1182(d)(5).

81.    Detention is designed to ensure that individuals who are flight risks appear for their removal proceedings and to protect the public from danger that might result from an individual's release and may not be universally imposed. *See* 8 C.F.R. § 212.5(b); *see also* 8 C.F.R. § 235.3(c).

82.    Parole for an individual who has been referred to an immigration judge for proceedings (an "asylum seeker") is justified "on a case-by-case basis for 'urgent humanitarian reasons' or 'significant public benefit,' provided the aliens present neither a security risk nor a risk of absconding." 8 C.F.R. § 212.5(b); *see also* 8 C.F.R. § 235.3 (stating that those individuals who have been found to have a credible fear may be paroled under Section 212.5(b) standards).

83.    Individuals "whose continued detention is not in the public interest" should also be released. 8 C.F.R. § 212.5(b)(5). Officials like the Defendants are therefore granted "reasonable discretion" to condition release on (1) "an undertaking by the applicant, counsel, or a sponsor to ensure appearances or departure," including a bond where appropriate; (2) community ties such as relatives with known addresses; and (3) an agreement to reasonable conditions, such as periodic reporting. 8 C.F.R. § 212.5(d). "Not all factors listed need be present for parole to be exercised." *Id.*

92591455.1

84.     The authority of the Secretary of DHS to continue holding an asylum seeker in custody or grant parole under Section 212(d)(5)(A) of the INA shall be exercised by the Assistant Commissioner, Office of Field Operations; Director, Detention and Removal; directors of field operations; port directors; special agents in charge; deputy special agents in charge; associate special agents in charge; assistant special agents in charge; resident agents in charge; field office directors; deputy field office directors; chief patrol agents; district directors for services; and those other officials as may be designated in writing, subject to the parole and detention authority of the Secretary or his designees.    The Secretary or her designees may invoke, in the exercise of discretion, the authority under Section 212(d)(5)(A) of the Act. 8 C.F.R. § 212.5(a).

### Directive 11002.1

85.     ICE has set forth its policy on parole of asylum seeker in ICE Directive 11002.1, "Parole of Arriving Aliens Found to Have a Credible Fear of Persecution of Torture," dated December 8, 2009 (hereinafter, the "Directive" or "Directive 11002.1").  A true and correct copy of Directive 11002.1 is attached hereto as **Exhibit A**.

86.     The Directive was issued "to ensure transparent, consistent, and considered ICE parole determinations for arriving aliens seeking asylum in the United States."    Directive 11002.1 § 1.

87.     Former DHS Secretary Kelly, through a memorandum dated February 20, 2017, reaffirmed the Directive's relevance and importance, advising that Directive 11002.1 remains "in full force and effect" today and "shall be implemented in a manner consistent with its plain language."  A true and correct copy of Secretary Kelly's February 20, 2017 Memorandum is attached hereto as **Exhibit B**.

92591455.1

88.     Under the Directive, "[a]n alien should be paroled under this directive if" the immigration officer determines that "the alien's identity is sufficiently established, the alien poses neither a flight risk nor a danger to the community, and no additional factors weigh against release." Directive 11002.1 § 8.3.

89.     "Additional factors" that weigh against the granting of parole "may include, but are not limited to, serious adverse foreign policy consequences that may result if the alien is released or overriding law enforcement interests." *Id*. § 8.3.

90.     The Directive further states that "continued detention" of an individual who establishes identity and has demonstrated that he is neither a flight risk nor a danger to the community "is not in the public interest." *Id*. § 6.2.

91.     The Directive instructs immigration officers to consider individualized factors after reviewing all documents, statements, and other evidence—such as the individual's ties to the United States, lack of criminal history, United States citizen sponsor, and documentation showing identification. *Id*. §§ 6.2 ("Each alien's eligibility for parole should be considered and analyzed on its own merits and based on the facts of the individual alien's case."), 8.3 (outlining the criteria for demonstrating identity, flight risk, danger to the community, and additional factors).

92.     The Directive acknowledges that "individuals who arrive in the United States fleeing persecution or torture may understandably lack valid identity documentation." *Id.* § 8.3. Accordingly, it provides that arriving asylum seekers need not necessarily present such documentation, but may establish their identity through third-party affiants or even simply credible statements such that there are no substantial reasons to doubt their identity.

92591455.1

93.     The Directive requires ICE Field Office staff, or DROs, to provide all individuals who have established credible fear with a notice, entitled "Parole Advisal and Scheduling Notification," in a "language he or she understands" or "through an interpreter if necessary." *Id.* § 8.1; *see id.* § 6.1. The "Advisal" shall set forth the time an individual will receive an initial interview for parole eligibility and the date by which documentary evidence in support of a parole application must be received. *Id.* §§ 6.1, 8.1.

94.     The Directive requires the Field Office staff, or DROs, to conduct an initial parole interview within seven (7) days of a finding that an arriving asylum seeker has a credible fear. *Id.* § 8.2.

95.     The Directive requires that asylum seekers, and their counsel, receive written notifications of parole decisions after the initial interview for parole. The notification must include a brief explanation of the reasons for denying parole and notify the alien that he or she may request a redetermination of parole. *Id.* § 8.2.

96.     The Directive requires ICE Field Offices to "uniformly document their parole decision-making processes" using a worksheet appended to the Directive. *Id.* § 6.2.

### ICE's Newark Field Office's *De Facto* No-Parole Policy

97.     At present, ICE's Newark Field Office has instituted a *de facto* policy of denying parole by failing to make individualized parole determinations for arriving asylum seekers who can establish their identity and show they present no flight risk or danger to the community.

98.     Human Rights First ("HRF"), a nonprofit, human rights organization that represents asylum seekers, has documented this trend. In its November 2016 report "Detention of Asylum Seekers in New Jersey," it states:

> For the past two years, pro bono attorneys have reported a significant change in the Newark ICE Field Office's implementation of the parole directive: many arriving asylum seekers who appear to meet the parole

release criteria and would have typically been granted parole are now remaining in detention for months. This shift mirrors a nationwide decline in adherence to the parole directive.

A true and correct copy of the report is attached hereto as **Exhibit C**. The report also notes that, during 2015 and 2016, not one of HRF's clients was granted parole and that, in a similar time period, the American Friends Service Committee ("AFSC"), another nonprofit organization that represents asylum seekers and is co-counsel in this case, represented 80 asylum seekers, only 3 of whom were granted parole, despite more than 40 individuals ultimately being granted asylum and a significant balance of them still pending a decision.

99.     The American Friends Service Committee reports that of the 54 asylum seekers it represented since January 2017, only one has been granted parole. It further reports that both lawyers and clients alike hesitate to invest resources in applying for parole because it is routinely denied and is, essentially, futile. A true and correct copy of the Certification of Lauren Major is attached hereto as **Exhibit D**.

100.     Further, in a July 2016 report entitled *Lifeline on Lockdown: Increased U.S. Detention of Asylum Seekers*, which is attached hereto as **Exhibit E**, HRF noted that, based on a comparison of data concerning the number of individuals considered for parole and the number of credible fear determinations for arriving asylum seekers, it appears that the Newark Field Office is no longer properly implementing the Directive's instruction to provide an asylum seeker determined to have a credible fear with a parole advisal and scheduling notification.

101.     Prior to 2014, the Newark Field Office generally granted parole to detained asylum seekers who met the criteria set forth in the Directive. In 2014, however, the ICE Newark Field Office changed its policy and began to deny parole at rates that created a *de facto*,

if not actual, policy of denying parole to virtually all asylum seekers, in violation of the procedures of Directive 11002.1.

102.    The *de facto* policy to deny parole is borne out by data collected through FOIA requests, which shows that the ICE Newark Field Office has gone from nearly uniformly *granting* parole in credible fear cases to nearly uniform*ly denying* it.  In 2010, 2011, 2012, and 2013, ICE granted parole regularly—in at least 95% of its decisions in credible fear cases.  Based on data collected pursuant to FOIA requests, from 2014–2016 that practice dramatically changed, with ICE *denying* parole in 94% of cases in 2016.  *See* Certification of Ingrid D. Johnson attached hereto as **Exhibit F**.  Data has been requested but not provided for following years.

103.    Despite FOIA requests seeking these and other documents, ICE has not produced evidence that the Newark Field Office maintains the worksheets as required by the Directive or complies with the timetables set forth in the Directive.

104.    The statistical data is consistent with immigration practitioners' observations and evidence in the Human Rights First November 2016 report, *Detention of Asylum Seekers in New Jersey*.

105.    As a matter of policy and practice, ICE categorically denies parole to eligible asylum seekers without any individualized consideration of whether their detention is necessary to prevent flight risk or protect the community.

106.    ICE's *de facto* no-parole policy is a drastic departure from prior practice and is contrary to its own stated policy as outlined in the Directive.

92591455.1

107.     While the Newark Field Office's granting of parole has dropped precipitously, ICE has requested increases in immigration detention space—seeking 51,000 additional immigration detainee beds, an increase of 25% over the previous fiscal year.

108.     Upon information and belief, the Newark Field Office has also failed to follow various procedural safeguards outlined in the Directive.  For example:

a.     ICE often fails to provide arriving asylum-seekers with notice that they may be eligible for parole and a scheduling notification;

b.     If ICE does provide a parole advisal and scheduling notification, it is provided on the same day as the scheduled interview and the interview itself does not take place;

c.     Many asylum-seekers must wait months for a parole interview, if one is conducted at all, despite the fact that Directive 11002.1 requires ICE to conduct initial parole interviews within seven days of a credible fear finding;

d.     ICE does not provide a parole determination to those who do not affirmatively apply for parole; and

e.     Where a response is provided, ICE frequently fails to provide an individualized reason for denial, instead providing a form letter with no indication that ICE gave individualized determination to that person's parole request.

109.     Defendants' detention of Plaintiffs and those similarly situated without any individualized determination of the legality of their custody is in violation of the laws, regulations, and Constitution of the United States.

110.     A blanket no-release policy in order to deter immigrants has been enjoined by the United States District Court for the District of Columbia.  *See R.I.L.R. v. Johnson*, 80 F. Supp. 3d 164 (D.D.C. 2015).

**Irreparable Harm**

111.    Plaintiffs and others similarly situated—despite being detained for a civil immigration offense rather than a criminal offense—are housed in prison-like facilities, where they are, *inter alia*, denied any outdoor recreation, subject to degrading and humiliating strip searches, and required to wear prison uniforms.  For example, the Elizabeth Contract Detention Facility, where D.A., S.K., and L.M. are detained, provides no access to the outdoors and is, upon information and belief, a former canned-goods warehouse.

112.    The prison-like detention exacerbates the trauma that Plaintiffs have already experienced in their countries of origin and during their flight to the United States.  Rates of anxiety, depression and symptoms of post-traumatic stress disorder ("PTSD") are extremely high among detained asylum seekers.  The rates increase the longer a person stays in detention.

113.    Upon information and belief, some individuals have been and are deterred from continuing their pursuit of asylum because the conditions isolate them from the physical world, restrict human contact, and ultimately lead to their physical and mental deterioration.

114.    Plaintiffs and the Proposed Class Members have suffered irreparable harm through extended, unnecessary detention.

115.    Concerns about increased escalation of the arbitrary use of detention are further exacerbated by recent executive actions, some of which are described in former Secretary Kelly's February 20, 2017 Memorandum.

116.    Immigration detention is not designed, nor permitted, to serve general deterrence and punitive purposes, which are properly the function of the criminal justice system.  *See Kansas v. Crane*, 534 U.S. 407, 412 (2002) (warning that civil detention may not "become a

'mechanism for retribution or general deterrence'—functions properly those of criminal law, not civil commitment") (citations omitted).

## CLASS ACTION ALLEGATIONS

117.    Plaintiffs brings this action on behalf of themselves and all other similarly situated persons pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2).  The proposed class is defined as follows:

> All arriving asylum seekers, who are found to have credible fear of persecution or torture, and are or will be detained in ICE facilities under the authority of the ICE Newark Field Office, and have been denied parole pending consideration of their asylum claims.

118.    The class is so numerous that joinder of all members is impracticable.  During the relevant time period, hundreds of arriving asylum-seekers have been detained pursuant to ICE's *de facto* no-parole policy, and therefore satisfy the class definition.  An influx of future members will continue to populate the class, making joinder impracticable.

119.    The issues presented in this action are likely to evade judicial review because Defendants have the ability to release or remove Plaintiffs before the court can resolve the issues.

120.    All proposed Class Members are subject to the same policy, namely, the Newark Field Office's policy of summarily denying parole to arriving asylum-seekers detained at detention centers.  The arbitrary policy is used against all asylum-seeking individuals.  The legality of ICE's *de facto* no-parole policy presents common questions of law and fact.  A decision on those questions will dispose of the claims of the entire class.

121.    The claims of the representative parties are typical of the claims of the class. Plaintiffs and the class of individuals they seek to represent have all been detained pursuant to the *de facto* no-parole policy.  The legal claims raised by Plaintiffs are identical to the class

92591455.1

claims. Representative Plaintiffs present the same, single question of law as all fellow class members.

122. Plaintiffs are adequate representatives because they seek the same relief as the other members of the class, to wit, the enjoining of Defendants from engaging in the *de facto* no-parole policy and determining custody based on an individualized determination of each person's eligibility for parole.

123. The proposed class would be represented by counsel from Drinker Biddle & Reath LLP. Counsel has extensive experience litigating class action lawsuits and complex civil litigation.

124. Defendants have acted on grounds generally applicable to the class by violating the relevant statutes and their implementing regulations and the United States Constitution in their treatment of class members; enforcing a detention policy against Proposed Class Members that is arbitrary and capricious; and detaining class members in violation of their due process rights. Thus, injunctive and declaratory relief is appropriate with respect to the class as a whole.

125. All Proposed Class Members are subject to irreparable injury because, absent an order from this Court, they are or will be detained without an individualized determination of their flight risk and danger to the community, as required by 8 U.S.C. §§ 1182(d)(5)(A) and 1225, their implementing regulations, and their right to Due Process.

### **CAUSES OF ACTION**

### **FIRST CAUSE OF ACTION**
### *Administrative Procedure Act – Violation of the Immigration and Nationality Act and Applicable Regulations*

126. All of the foregoing allegations are repeated and realleged as though fully set forth herein.

92591455.1

127.    The Administrative Procedure Act provides that, "[a] person suffering legal wrong because of agency action . . . is entitled to judicial review thereof." 5 U.S.C. § 702.

128.    Under the Administrative Procedure Act, a court shall "set aside" actions that are found to be, *inter alia*, "not in accordance with law," "contrary to constitutional right," and an "abuse of discretion." 5 U.S.C. § 706.

129.    Defendants are responsible for decisions and/or policies that govern the detention or parole of Plaintiffs and their release.

130.    Pursuant to policy and practice, Defendants have categorically caused the continued detention of Plaintiffs and persons similarly situated without an individualized determination of the justification for the detention in violation of the INA, applicable regulations, Directive 11002.1, and the United States Constitution.

131.    Defendants' adoption of a *de facto* no-parole policy for asylum applicants held in detention under authority of ICE's Newark Field Office and Defendants' illegal enforcement of said policy constitute final agency action for which there is no other adequate remedy.

## SECOND CAUSE OF ACTION
### *Administrative Procedure Act – Violation of the Due Process Clause of the Fifth Amendment to the United States Constitution*

132.    All of the foregoing allegations are repeated and realleged as though fully set forth herein.

133.    Under the Administrative Procedure Act, a court shall "set aside" actions that are found to be, *inter alia*, "not in accordance with law," "contrary to constitutional right," and an "abuse of discretion." 5 U.S.C. § 706.

92591455.1

134.    The Due Process Clause of the Fifth Amendment requires adequate procedural protections and a special justification that the need for detention outweighs a person's constitutionally protected liberty interest.

135.    Presumptive and continued detention without an opportunity for release subjects Plaintiffs and individuals similarly situated to detention without an individualized determination of flight risk and danger.

136.    Defendants have not given individualized consideration to the circumstances of Plaintiffs and those similarly situated in order to justify their continued detention.

137.    Accordingly, the ICE Newark Field Office is in violation of the Due Process Clause of the Fifth Amendment.

### THIRD CAUSE OF ACTION
*Administrative Procedure Act –* **De Facto** *Rescission of ICE Directive 11002.1*

138.    All of the foregoing allegations are repeated and realleged as though fully set forth herein.

139.    The *de facto* no-parole policy is arbitrary and capricious because it impermissibly deviates from ICE's own regulations and directives.  Directive 11002.1 provides that parole should be granted to individuals who have demonstrated their identity and shown that they are neither a flight risk nor a danger to the community.  It further provides that each individual's application for parole should be considered on its own merits and based on individual factors.

140.    Defendants' *de facto* no-parole policy impermissibly departs from Directive 11002.1.

92591455.1

141.    The *de facto* no-parole policy is in violation of the Administrative Procedure Act and is arbitrary and capricious, an abuse of discretion, and is contrary to the laws and Constitution of the United States.

**FOURTH CAUSE OF ACTION**
***Violation of the Due Process Clause of the***
***Fifth Amendment to the United States Constitution***

142.    All of the foregoing allegations are repeated and realleged as though fully set forth herein.

143.    The Due Process Clause provides that "no person . . . shall be deprived of . . . liberty . . . without due process of law." U.S. Const., amend. V.

144.    Asylum seekers who present themselves at a port of entry to the United States are "persons" who may not be deprived of liberty without due process of law under the Due Process Clause.

145.    The Due Process Clause permits civil immigration detention of an asylum seeker only where such detention is reasonably related to the government's interests in preventing flight or protecting the community from danger. Thus, due process requires an individualized assessment of flight risk or danger to the community to determine whether detention is justified.

146.    In addition, particularly where detention is prolonged, due process requires a custody hearing before a neutral decision-maker to determine if detention is necessary.

147.    Pursuant to the *de facto* no-parole policy, Defendants have detained Plaintiffs and similarly situated persons without individualized determinations through the parole process or at a custody hearing before a neutral decision-maker. Thus, the *de facto* no-parole policy violates the Due Process Clause.

92591455.1

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

a.    Certify this case as a class action lawsuit, under F. R. Civ. P. 23(b)(2), appoint Plaintiffs as class representatives, and appoint the undersigned counsel as class counsel;

b.    Declare that the *de facto* no-parole policy to be contrary to law and arbitrary and capricious;

c.    Enjoin Defendants from detaining Plaintiffs and the Proposed Class Members without a parole review or a custody hearing that includes an individualized determination of flight risk and danger to the community;

d.    Enjoin Defendants from taking any retributive action against Plaintiffs and the Proposed Class Members for filing the within lawsuit;

e.    Direct Defendants to follow the Directive with respect to all detainees eligible to apply for parole;

f.    Award Plaintiffs' counsel reasonable attorneys' fees under the Equal Access to Justice Act, and any other applicable statute or regulation; and

g.    Grant such further relief as the Court deems just, equitable, and appropriate.


DRINKER BIDDLE & REATH LLP



By: */s/ Vincent E. Gentile*

Dated:  May 15, 2018                Vincent E. Gentile
                                    Ingrid D. Johnson
                                    Antoinette Snodgrass
                                    Brendan P. McHugh
                                    105 College Road East
                                    Princeton, NJ  08542-0627
                                    Tel.:  (609) 716-6500
                                    Fax:  (609) 799-7000
                                    *Attorneys for Plaintiffs*

92591455.1